## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 08-193-P-S** |
| | ) | |
| **BRIAN K. ROGERS,** | ) | |
| | ) | |
| **Defendant** | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Brian K. Rogers, charged with knowingly possessing a laptop computer that contained images of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2256(8)(A), *see* Indictment (Docket No. 1), moves to suppress statements obtained from him by law enforcement officers on July 31, 2008, in asserted violation of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), *see* Motion To Suppress Evidence ("Motion") (Docket No. 15) at 3-4.[1]

An evidentiary hearing was held before me on February 9, 2009, at which the defendant appeared with counsel. The government tendered two witnesses and offered nine exhibits, which were admitted without objection. At the close of the hearing, the defendant moved to keep the record open for purposes of obtaining testimony *via* affidavit or telephonic deposition of Naval Criminal Investigative Service ("NCIS") special agent Heather Ryan, whom counsel for the government represented had a medical condition that prevented her from appearing in court. That motion was granted without objection, and the hearing was continued to February 19, 2009. On that day, the government offered an additional exhibit, a declaration of Heather D. Ryan,

---

[1] Per *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

which was admitted without objection.  At the close of evidence, both sides argued orally.  I now recommend that the following findings of fact be adopted and that the Motion be denied.

## I.  Proposed Findings of Fact

On July 31, 2008, at about 10 a.m., Detective William Moir of the Brunswick Police Department ("BPD") and Detective Laurie Northrup of the Maine State Police Computer Crimes Unit ("CCU") went to the home of the defendant and his wife, Heather Rogers, in Brunswick, Maine, to execute a search warrant obtained from the West Bath District Court that day and to conduct further interviews, if possible, in connection with a child pornography investigation.

The defendant had come to Moir's attention after the manager of a business known as the Coastal Trading Post telephoned him to report that suspected child pornography had been found on a used laptop computer that the trading post had purchased.  On July 22, 2008, Moir went to the trading post, reviewed a sales slip indicating that the laptop had been purchased from a Brian Rogers, took possession of the laptop, and brought it back to the BPD.  There, he removed the hard drive and used a stand-alone preview device to view its contents.  He found some thumbnail images with captions suggestive of the presence of child pornography.  The following day, he brought the laptop to the CCU.  He and several CCU employees and forensic examiners, among them Sergeant Glenn Lang, the supervisor of the CCU, conducted a preliminary examination of the laptop and concluded that it contained images of child pornography.  Lang made a printout of some of those images for use in obtaining a search warrant and/or interviewing a suspect.

Because Moir had learned that the defendant was affiliated with the Navy, he also contacted special agent Ryan of the NCIS on July 23, 2008, to advise her of the investigation.  In addition, he returned to the Coastal Trading Post and spoke to the employee who conducted the transaction with the defendant.  The employee verified to Moir that the defendant had shown

identification and noted that the defendant's wife had also brought a computer into the store that day. Moir prepared an affidavit on the strength of which a search warrant was issued on July 31, 2008. With the warrant in hand, Moir and a team of fellow law enforcement officers met at the BPD before heading to the defendant's home that morning. In addition to Moir and Northrup, the team included Lang, BPD Sergeant Martin Rinaldi, and BPD Detective Michael Andreotti. From criminal background checks, Moir knew that the defendant did not have a criminal record. So far as Moir knew, the defendant was unfamiliar with the criminal process.

That morning, Ryan was tasked with making contact with the defendant at his place of work, the Naval Air Station ("NAS") Brunswick, and asking him to return home. She and NCIS special agent Deborah Russell went to the NAS Brunswick to brief the defendant's commander at the Aviation Intermediate Maintenance Detachment about the investigation and to request authorization to search the defendant's work computer and work locker. *See* Gov't Exh. 7. Authorization for the searches was granted, but nothing of evidentiary value was found. *See id*.

Ryan also requested that the defendant's commander direct the defendant to meet her and Russell in the parking lot outside of the building in which he was working but refrain from telling him why. *See id*. Russell and Ryan met the defendant in the parking lot a short time later and identified themselves as NCIS agents. *See id*. Ryan told Rogers that he needed to go home but that it was not about his wife, who was then several months pregnant. *See id*. She did not provide any more details, and the defendant did not ask any questions. *See id*. The defendant agreed to go, and the conversation ended. *See id*. The entire encounter lasted approximately a minute. *See id*. Ryan later learned that Rogers had obtained a ride to his residence from one of his co-workers. *See id*.

As Moir and Northrup approached the defendant's home on the morning of July 31, 2008, Lang remained seated in an unmarked white CCU van parked across the street, and Rinaldi and Andreotti remained seated in an unmarked police cruiser also parked across the street.[2]  Both the van and the unmarked cruiser were approximately 75 to 100 feet from the defendant's front door.  Rinaldi and Andreotti remained seated in their cruiser during the entire visit and, to Moir's knowledge, never had contact with the defendant that day.

Moir wore a light green polo shirt and khaki pants and was armed, although he did not believe his firearm was visible because his shirt was untucked.  He carried with him a small hand-held digital tape recorder, which he used to record officers' conversation with the defendant's wife and then with the defendant at their home and, later, officers' interview of the defendant at the BPD.[3]  Moir did not ask the defendant's permission or that of his wife to record their conversations, and his recorder was not initially visible.  Northrup was attired in blue "BDUs," or fatigues, and a state police t-shirt and was visibly armed.

The defendant's wife, who was home alone when Moir and Northrup arrived, allowed them inside and brought them to a first-floor kitchen table in the couple's compact, two-story condominium unit.  The front door leads into a living room, and the kitchen is adjacent to that. Moir and Northrup questioned the defendant's wife concerning sales of computers to the trading post, who owned those computers, and whether she was aware of any child pornographic activities on her husband's part.  Lang, who was dressed in blue BDUs and wearing a state police

---

[2] The cruiser in which Rinaldi and Andreotti waited was a gray Crown Victoria with an antenna and blue lights in its back window.  On cross-examination, Moir admitted that it was fair to say that a person looking closely at it could tell it was some kind of law enforcement vehicle.

[3] Copies of Moir's audio recordings of the interviews at the defendant's home and the BPD were admitted into evidence without objection as Gov't Exhs. 1, 3, and 6, and copies of transcripts of those interviews containing Moir's handwritten corrections were admitted without objection, as an aid to the court, as Gov't Exhs. 1A, 3A, and 6A.

badge and a visible firearm, joined them about 20 to 25 minutes after the team's arrival at the home.

Approximately 40 minutes after the team's arrival, the defendant returned home.  Lang met him in the living room as he was entering the front door, identified himself and explained that officers had a warrant to search his residence.  Seconds later, Moir joined them while Northrup continued conversing in the kitchen with the defendant's wife.  The living room and the kitchen are in close enough proximity that it is possible to hear, from the living room, conversation going on in the kitchen.  The living room, which was 10 to 12 feet long, contained a couch, one or more chairs, and a computer table on which a computer was set up.  Lang, Moir, and the defendant initially sat together on the couch, with the defendant between them.  However, Moir soon moved to a chair when he realized that he was positioned in such a way as to block the defendant's egress from the room.

After Moir joined Lang and the defendant, Lang told him:

[T]he first thing I want you to be absolutely – we want to be absolutely clear with you about is, you're not under arrest, we're not going to be arresting you unless you've got a body hidden in the closet we don't know about, okay?  Um, we're just kind of at the beginning stages of an investigation, um, the laptops, or the computers you turned into the pawn shop, um, had some child pornography on it and we want to make sure that the child pornography is production crap that has been around the Internet for years and not something you created yourself.

Gov't Exh. 1A at 53-54.[4]  Lang never told the defendant that he was free to leave and did not have to speak with law enforcement officers.  Although the CCU is not itself responsible for investigating sexual assault of children, it has been involved in cases in which child victims were being exploited to produce child pornography.  Lang had no evidence that the defendant had sexually assaulted a child.  However, it is difficult for forensic examiners to tell whether child

---

[4] To the extent that I have quoted from the transcripts provided as an aid to the court, I have listened to the underlying recordings and satisfied myself that the transcripts accurately reflect their substance.

pornography stored on computers has been created by the computer's user, and Lang was aware of a statistical correlation between possession of child pornography and sexual abuse of children. Lang's foremost concern was to find, identify, and protect any child victims.  Lang also intended, by interviewing the defendant, to obtain additional evidence against him.  He did not disclose this last intention to him.

Lang, Moir, and the defendant engaged in a conversation in normal tones, with no one raising his voice or yelling.  At hearing, Lang described the interview as low-key and fairly cordial, with no unpleasantness, and the audiotape bears this out.  Neither Moir nor Lang unholstered or brandished his firearm or called the defendant's attention to it, and neither placed a hand on the defendant or used any physical force against him.  The defendant was quiet, focused on the conversation, and appeared to understand all questions asked of him.  At no time did he ask that the questioning stop, request to speak with a lawyer, or ask Moir or Lang to leave.

The defendant initially denied downloading any child pornography.  However, he admitted to doing so after Lang showed him small images reprinted on a sheet that Lang said had come from the defendant's laptop.  Lang thereafter commenced a forensic examination of the living-room computer, which he and Moir planned to seize pursuant to the search warrant.  Moir suggested that he and the defendant move to a different location and asked the defendant where he wanted to go.  The defendant suggested that they go outside.  They went out and stood in the driveway next to a vehicle.  Moir asked the defendant, "Still cool talking with me?" and the defendant responded, "I don't mind."  *Id*. at 63.  Moir inquired whether that was "a yes[,]" and the defendant responded, "Sure."  *Id*.

Moir continued to question the defendant, and Lang eventually joined them outside. Moir did not observe the defendant's demeanor to change when the two went outdoors.  He

continued to appear amenable to speaking with Moir, did not request that the questioning cease, and did not ask to speak with anyone else. When Lang joined them outside, he observed the defendant's demeanor to be lighter, and he and the defendant engaged in some small talk about the defendant's vehicle and other topics. Toward the end of the conversation in the driveway, Moir and the defendant engaged in the following colloquy:

> [Moir] – Okay. You want to go anywhere else? You happy right here? Is this fine still?

> [Defendant] – Yeah.

> [Moir] – Okay. This is your place, you want to go inside, you can tell me to whatever, but you're happy talking to me, I'm – that's fine, I appreciate it.

> [Defendant] – Doesn't bother me.

> [Moir] – Okay, good, we're trying to be low keyed – like (inaudible) search warrants we don't –see on TV – we don't kick the door down do any of this other stuff –

> [Defendant] – Yeah.

> [Moir] - . . . you know, we're easygoing that way so – okay. Anything else I'm missing? Today's the day mister, today is the day.

*Id.* at 85.

Lang, Moir, and the defendant ultimately were joined in the driveway by Ryan. Moir asked whether the defendant was willing to come down to the BPD for a more formal interview. Without hesitation, he agreed. Ryan asked the defendant no questions during the brief time that she was present at his home. *See* Gov't Exh. 7. The defendant and his wife drove in their own vehicle to the BPD, located a few miles away. Upon their arrival, they met Moir and Ryan in the lobby of the BPD, which is housed in the basement of the town office. Moir and Ryan took the defendant to an interview room, a small room containing a table, chairs, and a blackboard, while the defendant's wife waited in the lobby. Moir activated audiovisual recording equipment and

7

also again made an audio recording of the interview using his hand-held recorder.  At the outset

of the interview, Moir apprised the defendant, "You're not gonna be arrested today – as soon as

this interview's done you're – you're leaving."  Gov't Exh. 3A at 1.

Ryan explained that she was with the NCIS, that she was a civilian, and that she did not

work for the defendant's command.  *See id*. at 2.  The following exchange then occurred:

> [Ryan] – But because I am NCIS, when we talk to people, we have to read them
> what's called their military suspects rights.  Um, again, you're not arrested, you're
> free to go, you're not under any kind of custody, but it's a little – we – we're a
> little bit different than the local police department.  So that's why – before I talk
> to you, I have to read you this, so that you understand what your rights are, okay?
>
> [Defendant] – Okay.
>
> [Ryan] – Okay.  I'm just gonna write in here we're at Brunswick –
>
> [Moir] – And just so you know, we – we always say that this is not a locked
> environment.
>
> [Defendant] – Mmn, hmn.
>
> [Moir] – You're not locked in here – we're not forcing you to be right here, right
> now, okay?  And that door's unlocked – the one – that big door – that's all
> unlocked, so –
>
> [Defendant] – Okay.
>
> [Moir] – Nobody's gonna jump out and try to stop ya, fair enough?
>
> [Defendant] – Mmn, hmn.

*Id*. at 2-3.

Ryan next read the defendant the text of a form titled "Military Suspect's

Acknowledgement and Waiver of Rights."  *See id*. at 3-4; Gov't Exh. 4.  She informed him that

he had "the right to remain silent and make no statement at all[,]" that "[a]ny statement [he

made] can be used against [him] in a trial by court-martial or other judicial or administrative

proceeding[,]" that he had "the right to consult with a lawyer prior to any questioning[,]" who

might be "a civilian lawyer retained by [him] at no cost to the United States, a military lawyer appointed to act as [his] counsel at no cost to [him], or both[,]" that he had "the right to have my retained lawyer and/or appointed military lawyer present during this interview[,]" and that he could "terminate this interview at any time, for any reason." *Id*. She added: "So we start to talk and then you say that you don't want to talk anymore, you just say, I don't want to talk anymore. It's up to you." Gov't Exh. 3A at 3-4. She asked if the defendant had any questions about the rights she had read, and he responded: "Nope." *Id*. She explained that he was being asked whether he wished to waive those rights, inquiring, "So, basically, do you want to talk to us today?" *Id*. He responded: "I just want to get this over with." *Id*. Ryan pressed, "So, you're okay to talk to us?" *Id*. The defendant replied: "Mmn, hmn." *Id*.

At 11:38 a.m., the defendant signed a form indicating that he understood the rights conveyed to him and had decided that he did "not desire to remain silent, consult with a retained or appointed lawyer, or have a lawyer present at this time[,]" that he made that decision "freely and voluntarily[,]" and that "[n]o threats or promises have been made to me." Gov't Exh. 4. Ryan and Moir witnessed his signature. *Id*.; *see also* Gov't Exh. 3A at 4-5.

At about the time that Ryan was finishing reading the defendant his rights, Moir was briefly called away by his sergeant, who informed him that he needed to use the interview room. After the defendant signed the waiver of his rights, he, Moir, and Ryan vacated the interview room, and Moir set up an audiovisual recorder in the detectives' office at the BPD, a larger room containing six desks and work stations for BPD detectives. Moir and Ryan then recommenced their interview of the defendant in the detectives' office, with Moir again making both

audiovisual and audio recordings of the interview.[5] Moir informed the defendant, "[B]asically like before, I – I told you that the interview room was unlocked and all that – I – I didn't tell you, but I've – I need to tell you – this room's unlocked as well and . . . straight up the stairs – we'll get you outta here, okay, but she read your rights – *Miranda* rights – it's what we call *Miranda* rights – you understood those, right?" Gov't Exh. 6A at 5. The defendant responded, "Yes." *Id.* Moir went on, "Everything's signed, we're all good that way – you're gonna talk to us, right?" *Id.* The defendant replied, "Yeah." *Id.*

Moir did most of the questioning of the defendant at the BPD, although Ryan also asked several questions toward the end of the interview. Moir observed the defendant's demeanor to be about the same as it was at his home. He was agreeable, appeared to understand what was happening, and did not ask that questioning stop or that he be permitted to leave the room. If anything, in Moir's opinion, the defendant appeared more relaxed than he had been at his house. The interview was briefly interrupted a few times when other law enforcement officers came to retrieve gear from the room. However, for most of the time, only Ryan, Moir, and the defendant were present. At the conclusion of the interview, at Ryan's request, the defendant was photographed and fingerprinted. He and his wife then left the BPD approximately an hour after they had arrived.

## II. Discussion

The defendant seeks to suppress statements he made to law enforcement officers on July 31, 2008, on grounds that (i) he was subjected to custodial interrogation at his residence without benefit of *Miranda* warnings, (ii) the warning provided by Ryan at the police station, which was geared toward military tribunals, did not properly apprise him of his rights and therefore he did

---

[5] A CD containing a copy of the audiovisual recording of the brief interview in the BPD interview room was admitted without objection as Gov't Exh. 2. A CD containing a copy of the audiovisual recording of the continued interview in the detectives' room was admitted without objection as Gov't Exh. 5.

not knowingly and voluntarily waive them, and, (iii) even if the waiver of rights was properly obtained, it did not cure the taint of the failure to provide a *Miranda* warning at the defendant's home.  *See* Motion at 3-4.  The government bears the burden of proving *Miranda* compliance. *See, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992).  For the reasons that follow, I recommend that the court determine that the government has met its burden.

## A.  Applicable Legal Standards

The obligation of an officer to administer *Miranda* warnings attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations and internal quotation marks omitted).  Whether a person can be considered to have been in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *Id*. (citation omitted).

The determination whether there was such a restraint on freedom of movement hinges "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  *Id*. at 323.  *See also United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (relevant inquiry "is how a reasonable man in the suspect's position would have understood his situation") (citation and internal quotation marks omitted).

"Among the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation."  *United States v. Nishnianidze*, 342

F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).  "A suspect is usually not in custody in his home when officers merely want to speak with him."  *United States v. Ponce Munoz*, 150 F. Supp.2d 1125, 1133 (D. Kan. 2001).  "However, 'custody' for *Miranda* purposes may occur in one's home if the suspect is subject to the functional equivalent of arrest."  *Id*.

A defendant who is "in custody" for purposes of *Miranda* "may make a valid waiver of his rights under *Miranda* if he does so voluntarily, knowingly and intelligently."  *United States v. Downs-Moses*, 329 F.3d 253, 267 (1st Cir. 2003).  "The district court must begin with the presumption     that     the     defendant     did     not     waive     his     rights."  *Id*.  "The government bears the burden of proving a valid waiver by a preponderance of the evidence."  *Id*.

A waiver is considered "voluntary" if it was "the product of a free and deliberate choice rather than intimidation, coercion and deception"; it is "knowing and intelligent" if "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon."  *United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000) (citations and internal quotation marks omitted).  The question whether a given waiver was voluntary, knowing and intelligent is examined with reference to "the totality of the circumstances and the facts surrounding the particular case including the background experience and conduct of the accused."  *Id*. (citation and internal quotation marks omitted).

### B.  Questioning at Residence

At oral argument, counsel for the government contended that the defendant was not subjected to the functional equivalent of arrest during questioning at his residence given that (i) he was interviewed in the comfortable and familiar surroundings of his own home, (ii) while

several officers were present, only two interviewed him, and for a considerable period of time, only Moir interviewed him, (iii) no one physically restrained him or restricted his movements, (iv) no one brandished or displayed a weapon, (v) the audio recording bears out that the tone of the interview was low-key and professional, with no raised voices, (vi) while at one point Lang pressed the defendant, questioning his truthfulness, even then he used no raised voice or coercive tactic, (vii) Lang made clear to the defendant that he was not under arrest and would not be arrested unless, as Lang jokingly phrased it, a body was discovered, (viii) Moir asked the defendant on at least two occasions whether he was still willing to talk to him, and (ix) the interview lasted 90 minutes, not an overly long period of time.  *See also* Government's Opposition to Defendant's Motion To Suppress ("Opposition") (Docket No. 18) at 9-10. Counsel for the government acknowledged that Ryan's direction to the defendant to return home was, in effect, a factor cutting in favor of a finding of custody; however, he argued that the circumstances, in totality, indicate that he was not.

For her part, embellishing upon themes set forth in her papers, the defendant's counsel argued that her client was subjected to the functional equivalent of arrest at his residence because (i) Ryan directed that he return to his home, (ii) his home was under the complete and utter control of law enforcement officers upon his arrival and during the entire time he was questioned, and he did not have the opportunity to see or speak to his wife, (iii) he could not have told officers to leave because they had lawful authority to remain on the premises to execute the search warrant, (iv) upon his arrival, three officers were present in his home and two were seated in a recognizable, if unmarked, police vehicle parked across the street, (v) Moir directed him to move from the living room when Lang commenced his computer search, (vi) Lang's weapon was visible, (vii) while the defendant was told that he was not under arrest, no

13

one told him that he was free to leave the house or terminate the questioning, (viii) the officers'
tone was not professional and cordial, but rather quite forceful, and (ix) the defendant, a meek
and small man inexperienced in the ways of criminal process, was misled by Lang into believing
that officers were concerned with whether he had created child pornography, not whether he
possessed it.  *See also* Motion at 3-4; Reply to Government's Objection to Defendant's Motion
to Suppress Statements (Docket No. 22) at 1-2.

### 1.  Locale

 As counsel for the government suggested, and the defendant's counsel acknowledged at
oral argument, interview of a defendant in his own home is a factor typically weighing in favor
of a finding that the interview was non-custodial.  *See, e.g., Ponce Munoz*, 150 F. Supp.2d at
1133.  However, in this case, there are unusual twists.  The defendant was directed by a law
enforcement officer to return to his home from his workplace, where he found three officers in
his home, one of whom was interviewing his pregnant wife.  He may have noticed, as he entered
his home, a distinctive if unmarked Crown Victoria police cruiser parked across the street, in
which two additional officers were seated.  He no doubt observed Lang's visible, if holstered,
weapon.  He could not have directed the officers to leave, at least until such time as they had
fully executed the search warrant they had obtained from the West Bath District Court.  Arriving
home to such conditions undoubtedly would tend to undermine a reasonable person's sense of
comfort, security, and control in his own home.

Nonetheless, in my view, the officers' conduct once the defendant stepped into that
environment was such as to dissipate any sense that a reasonable person in his shoes might have
had that his home had been commandeered and his freedom curtailed by law enforcement
officers.  While the defendant did not speak with his wife upon his entry or at any point during

14

the recorded interview, there is no indication that she asked to speak with him or that he asked to speak with her, or that she otherwise was distraught by officers' presence. During the portion of the audiotape in which Lang and Moir interview the defendant in his living room, the defendant's wife and Northrup can be overheard chatting in normal tones of voice in the background.

At the outset of the interview in the living room, Lang truthfully assured the defendant that he was not under arrest and would not be placed under arrest that day absent finding "a body hidden in the closet." Moir deliberately positioned himself in such a manner so as not to block the defendant's egress from the small living room. As borne out by the audiotape, the tone of the interview was professional and low-key, with no raised voices or threats. The defendant, who initially sat on his living room couch and then moved outdoors to his driveway, was interviewed by only two officers while at his residence, and for a considerable period of time was interviewed solely by Moir. No one displayed or brandished a weapon or laid a hand upon the defendant. While Moir did suggest that he and the defendant leave the living room when Lang began to search the defendant's home computer, Moir asked the defendant where he wanted to go to chat, and Lang reminded him that he was not under arrest. *See* Gov't Exh. 1A at 62. Although no one expressly told the defendant that he did not have to speak with officers, Moir twice asked him if he was comfortable continuing to do so, implying that he was free to cease the questioning. The defendant was quiet and focused while inside, but his tone lightened and he was able to engage in some small talk after he and Moir moved outside.

In summary, Ryan's direction to the defendant to go home, coupled with the presence in his home upon his arrival of three officers possessing a search warrant, weighs in favor of a finding of custodial interrogation. Yet, the subsequent interview in the home, and the manner in

which it was conducted, cut in the other direction.  *See, e.g., United States v. Brobst*, No. CR 06-55-M-DWM, 2007 WL 844706, at \*3-\*4 (D. Mont. Mar. 16, 2007) (officer's direction to defendant to enter defendant's home weighed in favor of finding of custodial interrogation; however, the officers did not so dominate the scene inside the home as to render his brief interrogation custodial).

### 2.  Number of Officers Present

As noted above, the defendant returned home to find three officers in his house, and may have seen two others seated in an unmarked Crown Victoria parked across the street.  However, the two officers waiting outdoors never left their car, and Northrup never spoke with the defendant.  When Ryan arrived toward the end of the interview in the driveway, she did not personally interview the defendant at that time.  The defendant spoke initially only with Moir and Lang, and primarily only with Moir once he and Moir stepped outside.  This factor cuts against any finding that the defendant was in custody for *Miranda* purposes.

### 3.  Degree of Physical Restraint Placed Upon Suspect

There is no evidence that the defendant was physically restrained in any way during the residence interview or ordered to go anywhere in particular.  While Moir did suggest that he and the defendant leave the living room when Lang began his computer search, Moir gave the defendant the option to choose a new locale.  This factor cuts against any finding that the defendant was in custody for *Miranda* purposes.  *Compare, e.g., United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) ("While an interrogation in a defendant's residence, without more, certainly weighs against a finding of custody, the level of physical control the agents exercised over Mittel-Carey in this case [including ordering him to dress and go downstairs, telling him where to sit, physically separating him from his girlfriend, not allowing him to speak

16

to her alone, and accompanying him by police escort on the three occasions he was permitted to move, including while he used the bathroom] weighs heavily in the opposite direction, despite the fact that the control was exercised inside defendant's home.") (citations omitted).

### 4.  Duration and Character of Interrogation

Officers were present at the defendant's home for approximately 90 minutes on the morning of July 31, 2008, and interviewed him for approximately 50 minutes.  The defendant is small and, as noted by his counsel, appears meek and soft-spoken in the audiotapes and videotapes submitted into evidence.  Yet, in those audiotapes and videotapes, he also gives the impression of being well-spoken and intelligent. While the defendant was urged by both Lang and Moir on several occasions to be truthful, the tone of the interview is low-key and respectful. I hear no raised voices, threats, or coercive tactics on the audiotape of the residence interview. This factor, too, cuts against any finding that the defendant was in custody for *Miranda* purposes. *See United States v. Jewell*, 16 Fed. Appx. 295, 297-98 (6th Cir. 2001) (suspect was not in custody for *Miranda* purposes when he was informed upon arrival at his residence after execution of a search warrant there that he was not under arrest and would not be placed under arrest that day, was told that he was free to leave, was questioned for approximately one hour, and agent's actions and words were not hostile or coercive).

### 5.  Totality of Circumstances

This is not a garden-variety case in which a suspect is approached at home by officers who request permission to enter.  The defendant was directed by a law enforcement officer to go home, where he was greeted by two police officers and saw a third interviewing his pregnant wife.  He may also have observed two other officers sitting in a parked unmarked cruiser across the street.  The officers possessed a search warrant, which entitled them to remain in the home

until the search was completed.  Nonetheless, the defendant was immediately apprised that he would not be placed under arrest, was interviewed by two officers, and part of the time by only one, who adopted a cordial and low-key tone, was never physically restrained, and was asked twice if he was comfortable continuing to speak with the officers.  In the totality of these circumstances, I recommend that the court find that he was not in custody for *Miranda* purposes during the interrogation at his residence.

### C.  Questioning at Police Station

The government contends that the defendant likewise was not in custody when questioned at the BPD and, even assuming *arguendo* that he was, he was adequately apprised of his *Miranda* rights, which he knowingly and intelligently waived.  *See, e.g.*, Opposition at 10-12. At oral argument, counsel for the government reasoned that the defendant agreed to participate in a more formal interview at the BPD, drove there with his wife in their own vehicle, was told several times that he could leave at any time and was not under arrest, and participated in another low-key interview for approximately an hour.  He argued that the fingerprinting and photographing of the defendant at the conclusion of the interview, at Ryan's request, does not change the overall calculus because it occurred after the interview concluded, and the defendant and his wife left the BPD thereafter.  He finally contended that, even assuming *arguendo* that the defendant was in custody, Ryan effectively communicated his rights to him, and he knowingly and voluntarily waived them.

At oral argument, counsel for the defendant reasoned that her client was in custody for *Miranda* purposes at the BPD, noting, for example, that when he was brought to the detectives' room his egress was blocked, with Ryan sitting between him and the door, and he was fingerprinted and photographed while there.  She argued that he did not effectively waive his

*Miranda* rights because (i) he had no prior criminal justice experience and is a meek person, (ii) the waiver of military rights, as explained aloud by Ryan, did not make clear to an inexperienced person such as him that any statements could be used against him in a non-military setting such as this, and (iii) Lang and Moir engaged in coercive tactics in view of the defendant's meekness and inexperience, including Lang's statement, in urging the defendant to admit to downloading child pornography, that "I can show ya hundreds of pictures that are on [the defendant's] computer and when I talk children, we're talking children, all the way down to babies[,]" Gov't Exh. 1A at 55, and Lang's insinuation that officers were interested only in whether the defendant had created pornography, not in whether he accessed or possessed it.

Nonetheless, assessing the relevant factors, I readily conclude, and recommend that the court find, that the defendant was not in custody while interrogated at the BPD.

## 1.  Locale

Questioning of a suspect in a police station typically cuts in favor of a finding of custodial interrogation.  *See, e.g., Borodine v. Douzanis*, 592 F.2d 1202, 1207 (1st Cir. 1979) (suspect not in custody when, *inter alia*, "the locus [of questioning] was not a police station, nor even a neutral location, but a house to which he came as a familiar").  However, it is not in itself dispositive of the issue.  *See, e.g., United States v. Craighead*, 539 F.3d 1073, 1088 (9th Cir. 2008) (noting that an interrogation at an FBI office had been found non-custodial when the suspect was aware of freedom to depart and in fact returned home at the end of the interview without being arrested); *United States v. Baird*, 851 F.2d 376, 380 (D.C. Cir. 1988) (fact that interview took place at a station house was not sufficient to create a custodial situation requiring *Miranda* warnings).

### 2.  Number of Officers Present

The defendant was questioned at the BPD by two officers, Ryan and Moir.  This tends to weigh against a finding that he was in custody for *Miranda* purposes.

### 3.  Degree of Physical Restraint Placed Upon Suspect

There is no evidence that the defendant was physically restrained in any way during the BPD interview.  This tends to weigh against a finding that he was in custody for *Miranda* purposes.

### 4.  Duration and Character of Interrogation

The defendant was questioned for approximately an hour at the BPD.  He was not ordered to go there but, rather, asked whether he was willing to do so.  He drove there in his own vehicle with his wife, and left with her afterward.  At the outset of the interview in the interview room, Moir informed him that he was not under arrest, and Ryan told him that he could stop the questioning at any time.  When the three switched locales to the detectives' room, Ryan took a seat closest to the door.  However, Moir again informed the defendant that he was not under arrest and pointed out that the door was unlocked.  The defendant never asked to leave or to stop the questioning.  To the contrary, he made clear that he wished "to get this over with."  Gov't Exh. 3A at 4.  The tone of the interview was again low-key and cordial, with no raised voices or threats.

### 5.  Totality of the Circumstances

Apart from the fact that that the BPD interview took place at a police station, all other factors weigh in favor of a finding that the defendant was not in custody for *Miranda* purposes at that time.  The defendant was requested, not ordered, to go to the police station.  The tone of the questioning was low-key and cordial, and no physical restraint was applied.  The defendant was

20

apprised at the outset that he was not under arrest and that he was free to terminate the questioning.  In the circumstances, a reasonable person in his shoes would not have considered himself to be placed under the functional equivalent of arrest.

### D.  Waiver of *Miranda* Rights

Should the court disagree that the defendant was not in custody when questioned at the BPD, I recommend that it find that he was apprised of his *Miranda* rights at the outset of that interview and knowingly and intelligently waived them.

Ryan both read aloud and permitted the defendant to review a written Military Suspect's Acknowledgement and Waiver of Rights that informed him that he had the right to remain silent; that any statement he made could be used against him in a trial by court-martial or other judicial or administrative proceeding; that he had the right to consult with a lawyer prior to any questioning, who could be a civilian lawyer retained by him at no cost to the United States, a military lawyer appointed to act as his counsel at no cost to himself, or both; that he had the right to have his lawyer present during the interview; and that he could terminate the interview at any time and for any reason.  *See* Gov't Exh. 4.

While the defendant was inexperienced in criminal matters and appears quiet and meek, there is no suggestion that he was incapable of understanding this information.  Despite the form's emphasis on use of statements in a military context, it adequately apprised him of his *Miranda* rights.  *See, e.g., United States v. Gonzales*, Criminal No. 06-10292-PBS-5, 2007 WL 3071528, at *1-*2 (D. Mass. Oct. 18, 2007) (form that warned defendant that anything he said could be used against him but failed to specify that such statements could be used against him in a court of law or other proceeding adequately informed him of *Miranda* rights); *United States v. Newell*, 442 F. Supp. 668, 672 (S.D. Cal. 1977), *aff'd*, 578 F.2d 827 (9th Cir. 1978) (rejecting

21

argument that *Miranda* warning was deficient because the defendant was "not warned that any statements he made could be used in a criminal trial held in a civilian court, but only that they could be used against him at a court-martial"; noting, "This contention is an excellent example of placing form over substance.  The purpose of informing a suspect that any statements he makes can be used against him at a court-martial or a criminal trial in the federal court is to inform him of his 5th Amendment right against self-incrimination and of the possible serious consequences should he waive that right.  Since a court-martial and a federal criminal trial are consequences of equivalent seriousness, this purpose is served as equally by a warning that the statements may be used at a court-martial as it is by a warning that the statements may be used at a federal criminal trial.").

The defendant acknowledged in writing that he understood his rights and freely and voluntarily waived them.  *See* Gov't Exh. 4.  There is no reason to find otherwise.

### III.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress evidence be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.   A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 25th day of February, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge